**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEAH PRIDA, | ) | CASE NO. 5:23-cv-905 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| OPTION CARE ENTERPRISES, INC., | ) | |
| *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

This is a religious discrimination case in which defendants Option Care Enterprises, Inc. and Clinical Specialties, Inc. (collectively, "Option Care") are alleged to have violated Title VII of the Civil Rights Act of 1964 and Ohio Rev. Code § 4112.02 by failing to provide plaintiff Leah Prida ("Prida") a religious accommodation from Option Care's COVID-19 vaccination and testing policy. Before the Court are: (i) Option Care's Motion for Summary Judgment (Doc. No. 66 (Option Care's Motion)); and (ii) Prida's Motion for Partial Summary Judgment (Doc. No. 70 (Prida's Motion)). For the reasons stated herein, Option Care's motion is **GRANTED** and Prida's motion is **DENIED**.

## I.      BACKGROUND

Leah Prida is a former employee of Option Care, a healthcare provider that operates Clinical Specialties as a subsidiary. (Doc. No. 10 (Amended Complaint) ¶¶ 9, 11; Doc. No. 24

(Amended Answer) ¶¶ 9, 11.) Prida worked as a Cash Application Specialist with Option Care at its Hudson, Ohio, location. (Doc. No. 67-2 (Prida Dep. Ex.), at 18[1]; *see id.* at 47.)

Prida identifies as a Jehovah's Witness. (Doc. No. 67-1 (Prida Dep.), at 29.) Jehovah's Witnesses are not expressly prohibited from receiving the COVID-19 vaccine or undergoing COVID-19 testing, instead deeming those activities to be matters of personal choice.[2] (*Id.* at 129, 198–99.) Nevertheless, Prida's "interest has always been on the natural side of living and trying to do things the way that God wants us to do things[.]" (*Id.* at 153.) She adheres to an all-natural lifestyle, inspired by her parents who grew to distain the medical field after her grandmother died of breast cancer. (*Id.* at 152.) Prida claims that she is opposed to receiving the COVID-19 vaccine because "our body is our temple, God's temple" and the COVID-19 vaccine is "basically overriding our God-given immune system." (*Id.* at 154.)

On August 13, 2021, Option Care implemented a COVID-19 vaccination policy "in response to the COVID-19 pandemic and the state of emergency created by the pandemic as declared by various levels of government officials." (Doc. No. 68-2 (Rude Dep. Ex.), at 1.) Among other things, the vaccination policy required "all employees either[:] (i) establish that they have received a designated COVID-19 vaccine; (ii) obtain an approved exemption as an accommodation . . . ; or, for some employees (iii) submit to regular COVID-19 testing." (*Id.*) The vaccination policy further stated that:

> In the event . . . an employee objects to being vaccinated on the basis of sincerely held religious beliefs and practices, [Option Care] will engage in an interactive

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

[2] *See also Are Jehovah's Witnesses Opposed to Vaccination?*, JW.org, https://www.jw.org/en/jehovahs-witnesses/faq/jw-vaccines-immunization/ (last visited June 6, 2026) (stating that "[Jehovah's Witnesses] view vaccination as a personal decision for each Christian to make" and that "Jehovah's Witnesses have emphasized . . . [that] [h]ealth-care decisions are a personal matter").

> process with the employee to determine whether a reasonable accommodation can
> be provided that does not create an undue hardship for [Option Care] and/or does
> not pose a direct threat to the health or safety of others in the workplace and/or the
> employee.

(*Id.* at 2.) Employees who were granted an exemption from the COVID-19 vaccine were required to be enrolled in the Option Care Health COVID-19 Testing Program. (*Id.*) This program "require[d] employees to complete a weekly COVID-19 [t]est that will be provided by [Option Care]." (*Id.*) The policy also stated that while Option Care "will consider any accommodation request, it reserves the right to offer its own accommodation to the extent permitted by applicable law. Individuals who can receive the vaccination, but choose not to, will be subject to the disciplinary process." (*Id.*)

In a subsequent internal email circulated among Option Care employees, Option Care CEO John C. Rademacher ("Rademacher") specified that the COVID-19 vaccine was required "for leaders and patient and customer-facing team members" unless those team members cannot be vaccinated due to a medical condition or strongly held religious belief. (*Id.* at 4–5; *see id.* at 7–8.) Because Prida was not a patient or customer-facing team member, she was initially not subject to the vaccination policy. (Doc. No. 67-1, at 163; *see* Doc. No. 68-1 (Rude Dep.), at 11.)

On November 17, 2021, Rademacher sent a follow-up email to Option Care employees informing them that, because Option Care was a certified Medicare and Medicaid provider and federal contractor, it was required to comply with the Centers for Medicare & Medicaid Services Omnibus COVID-19 Health Care Staff Vaccination guidelines ("CMS Rule") and Executive Order 14042.[3] (Doc. No. 68-2, at 11–12.) Accordingly, Option Care "would require all . . . employees

---

[3] *See* Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555-01; Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50985.

[to] receive full vaccination or an approved medical or religious exemption by January 4, 2022[,] as a condition of employment" in order to comply with federal mandates. (*Id.* at 12.) This deadline to comply was later extended to February 28, 2022, in light of changes to the CMS Rule's enforcement. (*Id.* at 16–18.)

On December 28, 2021, Prida requested a religious accommodation from Option Care's COVID-19 vaccination policy.[4] (Doc. No. 67-2, at 47–49.) She attached the following to her request:

> I was raised as a Christian. I continue to follow God and the principals he laid out for us in his word. I strongly believe that vaccines and/or testing, violate his requirements set forth for us in the Bible. I sincerely believe that all human beings are made in the image of God and this concept affirms the unique value of ALL human life. [Quotations from Exodus 20:13 and 1 Corinthians 3:16–17, 6:19–20.] As Christians our bodies belong to God. We are accountable to our creator by the way we care for, maintain and protect our bodies. [Quotation from Romans 12:1–2.]
>
> In order to produce and manufacture these vaccines use abortion derived fetal cell lines. Partaking in such, offends me and my religious faith. I will not subject myself to testing either. The United States EPA has shown since 2016 Ethylene Oxide (EO) which is used in these PCR tests[5] on the cotton swab is a known human carcinogen. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6906442/
>
> This all relates to what I believe in, how I should care for and what I should do with my temple of God. I cannot in good conscience alter my God given body and will

---

[4] Although the accommodation request form *only* pertained to the COVID-19 vaccination requirement (Doc. No. 67-2, at 47; *see also* Doc. No. 69-1 (Coe Dep.), at 23–25 (explaining that Option Care reviewed Prida's accommodation request as to the COVID-19 vaccination only)), Prida also expressed refusal to subject to COVID-19 testing (*see* Doc. No. 67-2, at 50).

Prida later clarified that her basis for objecting to COVID-19 testing differed from that of the COVID-19 vaccination. She stated that "the [COVID-19] vaccine was different because the vaccines had the aborted fetal cell tissue lining that was used to make the vaccine, but the [COVID-19] testing had chemicals in it[.]" (Doc. No. 67-1, at 194.) Prida further stated that she lost both of her grandmothers to cancer, and knowing that cancer ran in her family, she "didn't want to subject [herself] [to the chemicals associated with COVID-19 testing] on a weekly basis." (*Id.*) When asked how this objection to COVID-19 testing related to her religious basis for seeking an exemption, she stated, "My religious basis was not putting something in my body deliberately that I knew could possibly cause me cancer years down the line." (*Id.* at 197.)

[5] Although Prida expresses concern about polymerase chain reaction ("PCR") testing, Option Care's chosen method of COVID-19 testing was antigen testing. (*See* Doc. No. 67-2, at 60.)

4

not risk the harm that may come from both the vaccines or the chemicals in the testings.

(*Id.* at 50 (citations modified).) No additional documentation was submitted in support of her COVID-19 vaccination accommodation request, and at no point in the request did Prida mention that she identified as a Jehovah's Witness. (*See id.* at 47–50.) Although Prida's COVID-19 vaccination accommodation request was formulated as a religious accommodation, Prida later stated that if she had a doctor at the time, she may have instead requested a medical accommodation because she previously "had reactions to chemicals [in the vaccine and testing swab] in the past." (Doc. No. 67-1, at 175.) "Either way," Prida recalled, "I was . . . looking for an exemption." (*Id.*)

While her accommodation request was pending, Prida met with her supervisor, Claudia Anastasopoulos ("Anastasopoulos"), to follow up on the status of her request. (*See* Doc. No. 69-2 (Coe Dep. Ex.), at 51–52.) Anastasopoulos sent an internal email to Option Care Director of Employee Relations Jeannie Coe ("Coe") on February 11, 2022, asking what information she could relay to Prida. (*Id.*) In that email, Anastasopoulos noted that Prida "has strong feelings about both receiving the vaccine and testing[.]" (*Id.* at 52.) That same day, Coe responded, "There is no route around testing if you are going in and have an accommodation [from receiving the COVID-19 vaccine]. They will be terminated if they do not comply with testing if they have an accommodation." (*Id.* at 51.) Anastasopoulos wrote back that Prida would not "stick the [COVID-19] tester up her nostril because she claims that the research documents she submitted with her exemption support that the substance on the end of the tester causes cancer." (*Id.* at 50.) Coe replied explaining that it would be "highly unlikely" for Option Care to be able to accommodate Prida's request regarding COVID-19 testing. (*Id.*)

Prida's request for accommodation from the COVID-19 vaccination requirement was approved on February 17, 2022, by Option Care Chief Human Resources Officer Michael Rude ("Rude"). (Doc. No. 68-2, at 50; Doc. No. 68-1, at 50.) Despite the fact that the accommodation request only pertained to the COVID-19 vaccination requirement (*see* Doc. No. 67-2, at 47–50), Prida believed that the accommodation was "all-encompassing" and also exempted her from COVID-19 testing. (Doc. No. 67-1, at 192.)

On February 22, 2022, Rude's assistant, Megan Hagglund ("Hagglund") informed Prida that her request to be exempt from COVID-19 vaccination was approved and that, pursuant to Option Care's policy (*see* Doc. No. 67-2, at 51), Prida would need to undergo weekly COVID-19 testing. (*Id.* at 59.) Days later, on February 25, 2022, Prida received instructions on how to comply with the weekly COVID-19 testing requirement. (*Id.* at 60–61.) Prida was instructed to complete her weekly COVID-19 testing by using company-provided at-home COVID-19 antigen tests.[6] (*Id.* at 60.) The testing process would be virtually monitored by a proctor over a video platform. (*Id.*) Once complete, the results of the test would immediately be shared to Option Care. (*Id.*)

On February 25, 2022, Prida responded to Hagglund's email by protesting having to comply with the COVID-19 testing requirement. (*Id.* at 56–58.) She wrote, "Not only was I raised very religious, I was also raised all natural." (*Id.* at 56.) She restated that she did not want to engage in weekly testing because the COVID-19 test swabs use ethylene oxide, which she believed is carcinogenic. (*Id.*) She also stated that the COVID-19 test kits contain sodium azide, which "can lead to numerous health issues" such as heart and brain damage, and included URL links to studies

---

[6] Antigen testing, sometimes referred to as rapid tests or self-tests, detect COVID-19 by identifying proteins from the SARS-CoV-2 virus. Typically, antigen tests collect samples using an anterior nares swab that is inserted at the front part of an individual's nostril. *See* COVID-19 Test Basics, U.S. Food & Drug Administration, https://www.fda.gov/consumers/consumer-updates/covid-19-test-basics (last visited June 25, 2026).

supporting her claims. (*Id.* at 56–57.) Prida's email concluded with her reiterating, "My body is my temple, given to me by God[,] and I do not take lightly what I choose to put in it, or choose not to put in it . . . . I cannot in good conscience alter my God given body 'my temple' and will not risk the harm that may come from the chemicals in the testing." (*Id.* at 58.)

Later that day, on February 25, 2022, Coe responded to Prida underscoring that "[t]esting is a requirement of those under an accommodation [from the COVID-19 vaccination requirement]" and that "[n]oncompliance with the testing program will result in termination." (*Id.* at 55–56.)

Prida thereafter emailed Rude explaining that she objected to testing (*id.* at 55) and sent him three "affidavits" [7] [8] (Doc. No. 67-1, at 223).

The first is titled "Affidavit of Declination for Offer of Medical Interventions, Products, and Devices" and—citing as "evidence" passages from the Bible, an 18th century North Carolina Supreme Court decision, the Convention on Human Rights and Biomedicine, the International Covenant on Civil and Political Rights, the Nuremberg Code, and various federal statutes—purports to state her "God-given right" to refuse COVID-19 testing. (*See* Doc. No. 67-2, at 62–67.) It concludes with Prida stating that she "decline[s] the offer of [Option Care's] medical interventions, products, and/or devices; including but not limited to facial coverings, testing, and vaccination." (*Id.*) Prida drafted this affidavit, in part, because she believes that "[God] made us in

---

[7] The three affidavits largely consist of legal-sounding but meaningless verbiage commonly used by adherents of the "sovereign citizen" movement. Because such language "is nothing more than a nullity[,]" *Blackwell v. State of Georgia*, No. 26-cv-1769, 2026 WL 1433953, at *2 (E.D. Pa. May 21, 2026) (collecting cases), the Court will only discuss the affidavits only insofar as they contain any information relevant to her claims.

[8] Prida stated that she drafted her affidavits using information she found on an online website. (Doc. No. 67-1, at 226.) She learned of this online website from a man who spoke at a "Medina freedom group" that Prida was involved with. (*Id.* at 226–27.) Prida recalled that the man, who was not a religious figure, spoke to the group about topics such as how "[t]he government and anything else is underneath us[,]" that "the only person or thing above us is God[,]" and the differences between the terms "legal versus lawful" and "regular court versus . . . common law court." (*Id.* at 227–28.)

his image, so we should be mindful of what He's asked us to do with our bodies," but also because "we should have a constitutional right to decline [COVID-19 testing]" and "not be[] experimented on[.]" (Doc. No. 67-1, at 233–34.)

The second document is titled "Notice of Liability and Fee Schedule" and appears to specify that she will levy a fine of $25,000 for "each incident of Trespass and Administration." (Doc. No. 67-2, at 68.) Prida believed that her body was her property and, "by common law," Option Care was committing trespass against her. (*See* Doc. No. 67-1, at 237.) Prida drafted this notice so that she could "try to get [Option Care] to cease and desist [the trespass against her]." (*Id.*)

The third document, titled "Affidavit/Declaration of Truth," states Prida's belief that she has a right under the U.S. Constitution, federal statues, the Declaration of Independence, and the Nuremberg Code to refuse COVID-19 vaccination and testing. (*See* Doc. No. 67-2, at 70–77.) She accuses Rude of "hav[ing] not thoroughly researched the COVID-19 injections or testing in order to determine if they have been fully tested or proven entirely safe" and that he "cannot prove . . . that the COVID-19 injection or testing will not catalyze a lifelong neurodegenerative process, disorder, or disease by poisoning and disabling [her] brain." (*Id.* at 74.) She then lists 26 ingredients she believes are contained in the COVID-19 vaccine that "are dangerous or damaging to [her] health and injecting them into [her] body would violate [her] dietary and religious practices[.]" (*Id.*) Prida writes that "[b]y demanding [she] get the COVD 19 [sic] testing in order to be employed, [Rude] [is] trespassing on [her] sovereign body property." (*Id.* at 79.) She concludes the document by demanding that Rude "cease and desist unlawful mandates about testing and employment." (*Id.*)

On March 1, 2022, Rude sent Prida an email acknowledging receipt of her documents and stated:

> Option Care Health maintains that it has offered a reasonable accommodation for your religious objections to our COVID vaccine policy. In managing our COVID vaccination policy, we follow the guidance of Federal agencies, such as the EEOC, CDC and FDA. Our position is still the same: If you are not able to work with the accommodation offered to you, that includes testing, the Company has no alternative to terminating your employment.

(*Id.* at 53.)

On March 2, Prida participated in two meetings with Anastasopoulos and another Option Care supervisor to discuss her accommodation request. (*See id.* at 88–95.) Prida surreptitiously recorded both meetings on her phone. (Doc. No. 67-1, at 265.) At neither meeting did Prida identify how her religious beliefs conflicted with COVID-19 testing.[9] (*See* Doc. No. 67-2, at 88–95.)

At the first meeting, Prida asked if her work schedule could be modified such that she would no longer need to undergo COVID-19 testing. (*See id.* at 90.) Anastasopoulos replied that Option Care could not grant that accommodation and that failure to comply with the testing requirement would result in termination. (*See id.* at 90–91.)

At the second meeting, Anastasopoulos asked whether Prida intended to comply with the COVID-19 testing policy. (*Id.* at 93.) Prida reaffirmed her refusal to test, stating that the COVID-19 tests were only intended to be administered by medical providers for symptomatic individuals, were not approved by the FDA, and could cause her health issues that would prevent her from being able to enjoy her hobbies. (*Id.* at 93–94.) Prida also stated her belief that her rights "come

---

[9] Prida, however, recalled that she had mentioned her religious beliefs during an unrecorded meeting with Anastasopoulos held on February 11, 2022. (Doc. No. 67-1, at 266–67.) During that meeting, she claims she informed Anastasopoulos that she had submitted a religious accommodation request and asked if she could perform some other form of COVID-19 testing in lieu of the method required by Option Care to avoid exposure to ethylene oxide from the testing swabs (ex. blowing a sample into a tissue). (*Id.* at 267–68.) Anastasopoulos told Prida that she would look into it. (*Id.*)

from God, and not from any mandates of any other man, not the government[.]" (*Id.* at 92.) When later asked during her deposition what she meant by this statement, she explained:

> God is over all of us . . . and we only need to . . . go to Him as far as what He tells us in His word, the Bible . . . . A mandate is not a law, so any of these mandates that were being given to us from the government, from a corporation, or from anyone else that was saying that we needed to go against our own body autonomy, that to me isn't right. That was a violation of my rights, my personal sovereign as my own sovereign citizen. I am my own person. I have the right to decline something[.]

(Doc. No. 67-1, at 272–73.)

On March 3, Anastasopoulos emailed Prida asking her if she intended to voluntarily decline the COVID-19 testing required as a condition of her COVID-19 vaccine accommodation and informing her that without testing she would be terminated from Option Care. (Doc. No. 67-2, at 85.) Prida replied by reiterating her concern than the COVID-19 testing kits used by Option Care were not FDA approved and contained harmful chemicals. (*Id.* at 84.) Once again, Anastasopoulos asked that Prida confirm that she understood that she would be terminated if she did not comply with the COVID-19 testing requirement. (*Id.* at 83.) Prida responded by stating that she was "not in agreement of voluntarily terminating [her] position with Option Care[,]" contended that she had "religious beliefs that affect all of the related measures of the vaccines and testing[,]" and accused Option Care of not providing her with a reasonable accommodation. (*Id.*) Prida was subsequently terminated from Option Care on March 9, 2022. (*See* Doc. No. 67-2, at 96, 98.) Shortly after her termination, Prida submitted a charge of discrimination with the Ohio Civil Rights Commission and the U.S. Equal Employment Opportunity Commission ("EEOC") and was issued a notice of a right to sue. (Doc. No. 67-2, at 1–2.)

On May 2, 2023, Prida filed the instant suit against Option Care. (*See generally* Doc. No. 1.) She asserts three claims: (i) religious discrimination for failure to accommodate under Title

VII, 42 U.S.C. § 2000e, *et seq.*; (ii) religious discrimination for retaliation under Title VII, 42 U.S.C. § 2000e, *et seq.*; and (iii) religious discrimination in employment under Ohio Rev. Code § 4112.02. (Doc. No. 10, at 14–16.)

Option Care moved to dismiss the suit pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 6 (Motion to Dismiss Original Complaint); Doc. No. 12 (Motion to Dismiss Amended Complaint).) The Court granted Option Care's motion to dismiss, concluding that Prida's refusal to participate in COVID-19 testing "was motivated—at best—by an isolated moral teaching that incorporates scientific and political factors, not religious belief." (Doc. No. 16 (Memorandum Opinion and Order), at 12.) The Court concluded that Prida did not plead sufficient facts to establish a claim under Title VII or Ohio Rev. Code § 4112.02. (*See generally id.*)

Prida appealed the Court's judgment (Doc. No. 18 (Notice of Appeal)) and the Sixth Circuit reversed the Court's dismissal (Doc. No. 20 (Mandate)). In light of two interceding cases that followed the Court's judgment, *Lucky v. Landmark Medical of Michigan*, 103 F.4th 1241 (6th Cir. 2024), and *Sturgill v. American Red Cross*, 114 F.4th 803 (6th Cir. 2024), the Sixth Circuit determined that, "*at the motion to dismiss stage*[,]" Prida "pled particular facts that support a reasonable inference that she refused to take weekly Covid tests because of her religious beliefs." *See Prida v. Option Care Enters., Inc.*, No. 23-3936, 2025 WL 460206, at *4–5 (6th Cir. Feb. 11, 2025) (emphasis added). The Sixth Circuit noted that although Prida's complaint survived a motion to dismiss, "discovery and summary judgment . . . will provide the opportunity to carefully scrutinize the basis of Prida's refusal to take Covid tests, including through a deposition of Prida." *Id.* at *5. The Sixth Circuit also concluded that Prida pled a Title VII retaliation claim and an Ohio Rev. Code § 4112 claim and remanded the case for further proceedings. *Id.* at *8.

After preliminary motion practice and an arduous period of discovery, the parties filed cross-motions for summary judgment. (Doc. No. 66; Doc. No. 70.) Both motions are opposed (*see* Doc. No. 78 (Prida Response); Doc. No. 79 (Option Care Response)), and each party filed a reply brief in support of their respective motions (*see* Doc. No. 80 (Prida Reply); Doc. No. 81 (Option Care Reply)).

## II.     LEGAL STANDARD

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, the Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. And if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party," then summary judgment is not appropriate. *Id*.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant

probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003) (quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) (citation omitted). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citation omitted)).

The standard for evaluating motions for summary judgment does not change simply because the parties present cross-motions. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted). "[T]he court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co.*, 929 F.2d at 248). The fact that the parties have filed cross-motions for summary judgment does not mean that summary judgment for one

side or the other is necessarily appropriate, and the Court may deny summary judgment altogether when genuine issues of material fact exist. *Parks v. LaFace Recs.*, 329 F.3d 437, 444 (6th Cir. 2003).

## III.    DISCUSSION

As noted, Option Care and Prida have filed cross-motions for summary judgment. (Doc. No. 66; Doc. No. 70.) Because the Court must evaluate each party's summary judgment motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party, *see Wiley*, 20 F.3d at 224 (citation omitted), the Court assesses each motion separately.

### A. Option Care's Motion for Summary Judgment

Option Care moves for summary judgment on all of Prida's claims. (Doc. No. 66, at 1.) Option Care argues that Prida "cannot establish a prima facie case under Title VII or Ohio law" because there is no dispute that "(1) her objections to Option Care's Covid testing requirement were not based on sincerely held religious beliefs; (2) she admitted there was no conflict between her alleged religious beliefs and the testing requirement; and (3) she did not put [Option Care] on notice of any such conflict (because none existed)." (Doc. No. 66, at 19.) Option Care further avers that, even if Prida had established a prima facie case of failure to accommodate under Title VII, "Option Care would still be entitled to summary judgment based on the undue hardship defense." (*Id.* at 9.) Lastly, Option Care contends that Prida's retaliation claim fails because the undisputed facts show she did not engage in protected activity under Title VII and that, even if she did, she cannot establish that she was terminated for engaging in such activity. (*Id.* at 9, 25.)

#### 1.    *Title VII Religious Accommodation Claim*

Title VII makes it unlawful for covered employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" 42 U.S.C. § 2000e-2(a)(1). But a covered employer is not required to accommodate an individual's religion should it "demonstrate[] that [it] is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.*

At the summary judgment stage, courts adopt a two-step approach in assessing Title VII religious discrimination claims. First, the employee must establish a prima facie case of religious discrimination. *DeVore v. Univ. of Kentucky Bd. of Trs.*, 118 F.4th 839, 845 (6th Cir. 2024) (citing *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007)), *cert. denied,* 145 S. Ct. 1903, 225 L. Ed. 2d 648 (2025). This requires the employee to demonstrate that "(1) the employee has a sincere religious belief that conflicts with an employment requirement; (2) the employer was on notice about the conflict[]; and (3) the employee was discharged or disciplined for failing to comply with the conflicting employment requirement." *Id.* (quotation marks and citation omitted.) Once the employee makes this prima facie showing, the employer may demonstrate that accommodating the employee's religion would impose an "undue hardship." *Id.* Showing "undue hardship" requires that the employer demonstrate that accommodation would impose a substantial burden in the context of the employer's business. *Id.* (citing *Groff v. DeJoy*, 600 U.S. 447, 471, 143 S. Ct. 2279, 216 L. Ed. 2d 1041 (2023)).

### a. Sincere Religious Belief

To prevail on a failure to accommodate claim, a plaintiff first must show that they held a sincere religious belief. *Id.* (citation omitted). To be a sincere religious belief, the belief must be: (i) "religious in the plaintiff's 'own scheme of things[;]'" and (ii) "sincerely held." *Brown v. MGM Grand Casino*, No. 2:22-cv-12978, 2024 WL 4819575, at *4 (E.D. Mich. Nov. 18, 2024) (citing

*Speer v. UCOR LLC*, No. 3:22-cv-426, 2024 WL 4370773, at *5 (E.D. Tenn. Oct. 1, 2024) (further citation omitted)). "While it is not the place of a court to disregard or reject a belief as not 'religious' simply because it does not fall squarely within a well-known religious doctrine, a court must still evaluate whether the belief is religious in nature and whether it is sincerely held." *Speer*, 2024 WL 4370773, at *6 n.10 (citing *United States v. Seeger*, 380 U.S. 163, 185, 85 S. Ct. 850, 13 L. Ed. 2d 733 (1965)). "If a plaintiff asserts a belief that is religious on its face, she must then demonstrate that it is 'sincerely held,' not merely a 'pretextual assertion of a religious belief in order to obtain an [accommodation].'" *Id.* at *6 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) (alteration in original)).

"'Religion' is defined broadly under Title VII to include 'all aspects of religious observance and practice, as well as belief.'"[10] *Speer*, 2024 WL 4370773, at *5 (quoting 42 U.S.C. § 2000e(j)). "A religious belief need not be acceptable, logical, consistent, or comprehensible to others in order to merit protection, and Title VII is agnostic to the reasonableness of the particular belief or practice in question." *DeVore*, 118 F.4th at 845–46 (citing *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) (quotation marks omitted)). Once a plaintiff's religious belief is established, courts "may not question the veracity of one's religious beliefs." *Sturgill*, 114 F.4th at 809 (citations omitted). Title VII protection,

---

[10] Prida interprets Title VII's definition of religion to mean that "[a] motivation is religious where its operative content is a moral judgment about right and wrong grounded in the believer's understanding of obligation to God" and that "[a] motivation does not lose its religious character because the moral judgment is applied to factual information[.]" (Doc. No. 78, at 13.)

The Court rejects Prida's proposed interpretation. First, the Court notes that Prida's method of statutory interpretation is flawed. While Prida purports to identify the term's ordinary public meaning at the time of enactment, she relies on a 1755 English dictionary. (*Id.*) But Title VII was enacted in 1964—well after the publication of the dictionary Prida relies on. Second, even if Prida's method was not flawed, her proposed definition is at odds with the Supreme Court's trend away from interpreting religion in "wholly theistic" terms. *See Africa v. Com. of Pa.*, 662 F.2d 1025, 1031 (3d Cir. 1981).

however, does not attach to "purely secular beliefs, such as those that are essentially political, sociological, or philosophical, a matter of personal preference, or the product of a merely personal moral code." *DeVore*, 118 F.4th at 845 (quotation marks and citations omitted) (collecting cases). Furthermore, secular beliefs do not become religious simply because the plaintiff is generally religious. *Speer*, 2024 WL 4370773, at *9 n.16.

After a review of the record, and viewing the evidence in the light most favorable to Prida, the Court concludes that Prida fails to present evidence from which a reasonable jury could find that Prida's objections to COVID-19 testing are religious in nature. Rather, Prida's objections "are essentially political, sociological, or philosophical, a matter of personal preference, or the product of a merely personal moral code" and therefore do not warrant protection under Title VII. *See DeVore*, 118 F.4th at 845 (quotation marks and citations omitted).

Prida identifies as a Jehovah's Witness. But Jehovah's Witness teachings treat COVID-19 vaccination and testing as a matter of personal choice. Prida herself understood as much, stating that her Jehovah's Witness faith did not prohibit her from receiving the COVID-19 vaccine or participating in COVID-19 testing. (Doc. No. 67-1, at 129.) Consistent with this understanding, nothing in Prida's COVID-19 accommodation request, nor in any subsequent email correspondence with Rude, Anastasopoulos, or Hagglund, mentions her Jehovah's Witness faith as a basis for rejecting the COVID-19 testing requirement.[11] Prida's Jehovah's Witness faith therefore cannot support her Title VIII claim.

---

[11] The first written mention of Prida's Jehovah's Witness faith is in her charge of discrimination which was submitted to the Ohio Civil Rights Commission and the EEOC well after she was discharged from Option Care. (*See* Doc. No. 67-2, at 1.) In that submission, Prida includes no explanation as to how her Jehovah's Witness faith prevented her from participating in COVID-19 testing. The submission merely states in conclusory fashion that "I believe I have been discriminated against because of my religion, Jehovah's Witness, in violation of Title VII[.]" (*Id.*)

Prida's objections to COVID-19 testing were instead based on her conviction that her body is a "Temple of God" (Doc. No. 67-2, at 50), that she "cannot in good conscience alter [her] God given body" (*id.*), that she has a "God-given right" to decline COVID-19 testing (*id.* at 63), and that any efforts to require her to participate in COVID-19 testing would be "trespass[] on [her] sovereign body property" (*id.* at 79). Although this does not directly align with Jehovah's Witness teachings for the reasons discussed above, the Court recognizes that it may not "disregard or reject a belief as not 'religious' simply because it does not fall squarely within a well-known religious doctrine[.]" *Speer*, 2024 WL 4370773, at *6 n.10 (citation omitted). The Court "must still evaluate whether the belief is religious in nature[.]" *Id.*

A closer look at Prida's beliefs as they relate to her objections to COVID-19 testing reveal that they are secular in nature.[12] Although Prida makes general "body-is-a-temple" claims, the undisputed evidence shows that her specific objections to COVID-19 testing are political, scientific, matters of personal preference, or products of a merely personal code. At the outset, Prida underscored her refusal to test because of the purported health risks associated with COVID-19 testing. In her COVID-19 vaccination request—where she makes her first express objection to COVID-19 testing—she explains that she "will not subject [herself] to testing either" because "[t]he United States EPA has shown since 2016 Ethylene Oxide (EO)[,] which is used in these

---

[12] To be sure, Prida likely did articulate religious objections to receiving the COVID-19 *vaccine*, stating that she would refuse the vaccine because it was developed using aborted fetal cell tissue. (Doc. No. 67-2, at 50.) Option Care accepted this representation and granted her a religious exemption from the vaccine requirement. But at issue in this case is Prida's refusal to participate in Option Care's COVID-19 *testing* requirement, not Option Care's COVID-19 *vaccination* requirement. And, as Prida admitted in her deposition, her objection to COVID-19 testing was different than her objection to COVID-19 vaccination. (Doc. No. 67-1, at 194.) The Court's analysis is therefore based on the specific objections Prida makes regarding COVID-19 *testing*. To the extent Prida makes legitimate religious objections to receiving the COVID-19 vaccine, they have no bearing on her distinct objections to COVID-19 testing. *Cf. DeVore*, 118 F.4th at 847 ("[Plaintiff] therefore cannot demonstrate a conflict between her religion and [her employer's COVID-19 testing policy] solely by bootstrapping her testing objections to her vaccine objections.").

PCR tests on the cotton swab[,] is a known human carcinogen." (Doc. No. 67-2, at 50.) Her

subsequent communications with Rude, Anastasopoulos, and Hagglund focus near exclusively on

her concerns regarding the chemicals used in COVID-19 testing and her political views regarding

her purported sovereignty:

- **February 25, 2022**: In an email to Hagglund, Prida dedicates several paragraphs explaining her concern that the COVID-19 test swabs use ethylene oxide which "[have] been shown . . . to be carcinogenic in humans" and that the home testing kits also contain sodium azide which "can cause heart and brain damage[.]" (Doc. No. 67-2, at 56–58.) Her email also includes several URL links to news articles and studies allegedly supporting her contentions. (*Id.*) Only in the final paragraph of her email does she tie in her COVID-19 testing objections with her purported religious belief that she "cannot in good conscience alter [her] God given body[.]" (*Id.* at 58.) But she then ends her email by stating that she "will not risk the harm that may come from the chemicals in the testing." (*Id.*)

- **February 28, 2022:** Prida sends three affidavits to Rude. Her first affidavit does not specifically explain how her religious beliefs prevent her from participating in COVID-19 testing. Instead, it generally asserts that Prida is "a creation of God-Almighty and a follower of God's laws . . . first and foremost" and that "the Bible is 'the rock on which our Republic rests[.]'" (*Id.* at 62.) Prida states that she "retains the unalienable and indefeasible, God-given right to decline all attempts to . . . alter any and all of her God given biological materials . . . of which her Creator has granted her sole possession[.]" (*Id.* at 63.) Her second affidavit warns Option Care that she will enforce a fine of "25,000.00 per man or woman involved" for "each incident of Trespass and Administration[.]" (*Id.* at 68.) The third affidavit, citing sections of the U.S. Constitution, U.S. Code, and Supreme Court cases, purports to make a legal argument that Option Care's COVID-19 testing requirement constitutes "trespass[] on [Prida's] sovereign body property" and that "mandates [about COVID-19 testing] are unconstitutional and a violation of [her] unalienable rights." (*Id.* at 79.) The affidavit also includes a list of ingredients allegedly in the COVID-19 vaccine and states that Option Care has not proven that "the COVID-19 injection or testing will not catalyze a lifelong neurodegenerative process, disorder, or disease by poisoning and disabling [Prida's] brain." (*Id.* at 74.) While Prida's affidavits make cursory references to religious texts and state her purported God-given rights, she does not articulate a religious objection to COVID-19 testing.

- **March 1, 2022:** In an email to Rude, Prida conveys "the research [she] [had] done regarding the [COVID-19] testing." (*Id.* at 53.) She also included a URL

link to a video that that included information about "nasals swabs and testing." (*Id.*) Nowhere in this email did Prida articulate a religious objection to COVID-19 testing.

- **March 2, 2022:** In a meeting with Anastasopoulos and another Option Care supervisor, Prida stated her belief that her rights "come from God, and not from any mandates of any other man, not the government, . . . not a corporation[.]" (*Id.* at 92.) Prida then explained that she would refuse to undergo COVID-19 testing because the tests are "not supposed to be given to asymptomatic people and regularly." (*Id.* at 94.) She also expressed concern that the COVID-19 tests could expose her to chemicals that could cause cancer. (*See id.*) Beyond the general assertion that her rights come from God, Prida does not articulate a religious objection to COVID-19 testing.

- **March 4, 2022:** In an email to Anastasopoulos, Prida affirms her refusal to undergo regular COVID-19 testing. She states that the COVID-19 test kit used by Option Care "is listed for use under Emergency Use Authorization only[]" and "is NOT FDA approved." (*Id.* at 84 (emphasis in original).) Prida states that the COVID-19 test kits "are not meant to be taken weekly and not meant to be given to people who are showing no symptoms." (*Id.*) She also reiterated her concerns "about the chemicals used in these tests[.]" (*Id.*) Prida makes no reference to any religious objection to COVID-19 testing.

Prida has failed to put forth sufficient evidence on which a jury could reasonably find that her objections to COVID-19 were religious in nature. *See Anderson*, 477 U.S. at 252 (holding that for a plaintiff to survive summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff"). Her objections instead reflect beliefs that are largely political, scientific, matters of personal preference, or products of a merely personal code. Specifically, Prida's objections are centered on her beliefs that: (i) she has "sovereign" God-given rights over her bodily autonomy; (ii) federal and international law guarantee Prida a right to reject COVID-19 testing; (iii) she should adhere to a natural lifestyle; and (iv) she should avoid carcinogenic substances. No jury could reasonably conclude that these beliefs are genuinely religious, even in light of Title VII's broad definition of religion. Such beliefs are not entitled to protection under Title VII. *See DeVore*, 118 F.4th at 845 (holding that Title VII does not protect "purely secular

20

beliefs, such as those that are essentially political, sociological, or philosophical, a matter of personal preference, or the product of a merely personal moral code." (collecting cases)). And the mere fact that Prida identifies as religious does not afford her non-religious beliefs any protection either. *Speer*, 2024 WL 4370773, at *9 n.16.

Many of Prida's professed views closely resemble those held by adherents of the so-called sovereign citizen movement—views that are plainly non-religious. Sovereign citizens "are a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *United States v. Ulloa*, 511 F. App'x 105, 106 n.1 (2d Cir. 2013). Several of Prida's objections to COVID-19 testing relate not to any specific religious tenet, but instead her broader anti-government political views. Prida claims to be "a living woman retaining all of her unalienable and indefeasible God given rights" and that these rights "come from God, and not from any mandates of any other man, not the government . . . not a corporation." (Doc. No. 67-2, at 63, 92.) This, in her eyes, gives her latitude to outright refuse to engage in COVID-19 testing because "[s]uch mandates are unconstitutional and a violation of [her] unalienable rights." (*Id.* at 79; *see also* Doc. No. 67-1, at 227 ("[T]he only person or thing above us is God. The government and anything else is underneath us[.]"); *id.* at 273 ("[Option Care's COVID-19 testing mandate] was a violation of my rights, my personal sovereign as my own sovereign citizen.").) Not only are these views "completely without merit" and "patently frivolous," *see United States v. Jagim*, 978 F.2d 1032, 1036 (8th Cir. 1992), they are not religious. *See, e.g., Parks-El v. Diggs*, No. 1:22-cv-514, 2023 WL 6813151, at *5 (M.D.N.C. July 10, 2023) (citation omitted), *report and recommendation adopted*, 2023 WL 6809721 (M.D.N.C. Oct. 16, 2023); *United States, v. Hutson,* No. 16-cr-186, 2018 WL 345316, at *5 (D. Colo. Jan. 10, 2018), *aff'd*, 790 F. App'x 166 (10th Cir. 2019); *Love v. N. Carolina Dep't of Pub.*

21

*Safety*, No. 5:19-cv-75, 2020 WL 6050583, at \*4 (W.D.N.C. Oct. 13, 2020), *aff'd sub nom. Love v. Lassiter*, 845 F. App'x 283 (4th Cir. 2021); *but cf. Edwards v. King*, No. 7:21-cv-47, 2022 WL 875039, at \*4 (W.D. Va. Mar. 23, 2022) (assuming for purposes of deciding a motion, without definitively ruling so, that plaintiff's sovereign citizen beliefs were religious in nature), *aff'd,* No. 22-6375, 2022 WL 4182765 (4th Cir. Sept. 13, 2022). Her antigovernment opposition views regarding COVID-19 testing do not warrant Title VII protection. *See DeVore*, 118 F.4th at 845 (recognizing that Title VII does not protect views that are "essentially political" (collecting cases)).

That Prida's objections are cloaked in religious-sounding "body-is-a-temple" language does not alter the Court's conclusion. "The notion that all of life's activities can be cloaked with religious significance cannot transform an otherwise secular idea into a religious belief." *Caruano v. Bayhealth Med. Ctr., Inc.*, 714 F. Supp. 3d 461, 466 (D. Del. 2024) (quotation marks and citation omitted)), *aff'd sub nom. McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024), *cert. denied sub nom. Harvey v. Bayhealth Med. Ctr., Inc.*, 145 S. Ct. 2848, 222 L. Ed. 2d 1131 (2025). Yet this is exactly what Prida has done here. Prida makes "body-is-a-temple" claims but then explains her objection with "explicitly personal, nonreligious judgments"—such as her concern that COVID-19 testing kits used by Option Care cause cancer, were not FDA approved, and were not intended for regular use on asymptomatic individuals. These objections, as well as her political views relating to the government's power over self-proclaimed sovereign citizens, are not religious in nature. *See, e.g., Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 899–900 (9th Cir. 2025) (finding that plaintiff had failed to plead a Title VII claim because "[plaintiff's] objection to testing is grounded in the secular belief that the nasal swabs in

22

antigen tests are carcinogenic")[13]; *Gatto v. Johnson & Johnson Servs., Inc.*, No. 24-1992, 2025 WL 816732, at *3 (3d Cir. Mar. 14, 2025) (finding plaintiff had failed to plead a Title VII claim in part because her objection to testing "rests largely on her view that inserting substances into her body has negative impacts" and that such an objection "is based on her personal and medical preferences, not religion"); *Ellison v. Inova Health Care Servs.*, 692 F. Supp. 3d 548, 558 (E.D. Va. 2023) (finding plaintiff's "body-as-a-temple" objection to the COVID-19 vaccine could not support a Title VII claim because "though couched in religious terms, [plaintiff] refused the vaccines based on concerns of vaccine safety"); *Geerlings v. Tredyffrin/Easttown Sch. Dist.*, No. 21-cv-4024, 2021 WL 4399672, at *7 (E.D. Pa. Sept. 27, 2021) (rejecting plaintiff's "body-is-a-temple" objection to defendant's masking mandate because while "the notion that we should not harm our bodies is ubiquitous in religious teaching . . . a concern that a treatment may do more harm than good is a medical belief, not a religious one" and that it "would be a step too far to count everything [plaintiff] believes about healthy living as a religious practice" (citation omitted)).

Prida's situation closely resembles that of the plaintiff in *DeVore*. In that case, the plaintiff sought an accommodation from her employer's COVID-19 testing policy because it interfered with her religious obligation to treat her body as a "temple." *DeVore*, 118 F.4th at 846. The plaintiff's request stated that she held a "sincere religious belief" that she refuse "subjecting [herself] to regular, repeated medical interventions against [her] will[.]" *Id.* at 842. She also sent her employee a memorandum explaining her belief that COVID-19 testing posed several adverse

---

[13] The Court recognizes that the Ninth Circuit's Title VII pleading standard as articulated in *Detwiler* presents a more stringent standard than that of the Sixth Circuit. *See id.* at 899 (categorizing the Sixth Circuit's approach in *Lucky* as "far too permissive"). But, given its procedural posture, *Lucky* only addressed the *pleading standard* for Title VII religious discrimination claims. *See Lucky*, 103 F.4th at 1244. The Sixth Circuit's holding in *Lucky* did not go as far as to also apply to plaintiff's establishment of their prima facie case, which is at issue here.

23

health risks. *Id.* at 843. She also relayed her view that COVID-19 testing constituted "medical experimentation" that conscripted human research subjects into participating in a medical experiment without consent. *Id.* The plaintiff's employer denied her request to be exempt from the COVID-19 testing requirement for unvaccinated employees, and the plaintiff subsequently sued her employer for engaging in religious discrimination in violation of Title VII. *Id.* at 841, 843.

The Sixth Circuit affirmed the district court's grant of summary judgment in favor of the employer in *DeVore*, finding that the plaintiff drew no connection between her objection to COVID-19 testing and any "religious principle" she followed, "leaving it simply to reflect her personal moral code." *Id.* at 847–48 (quotation marks and citation omitted). Because plaintiff failed to show a conflict between her "religion" and her employer's policy, nor did she even identify what religion she adhered to, the Sixth Circuit concluded that plaintiff's Title VII claim failed at summary judgment. *Id.* at 847–48.

Here, just as in *DeVore*, Prida avers that she cannot participate in COVID-19 testing because her body is a "temple of God" which she "cannot in good conscience alter" by exposing herself to the perceived carcinogenic effects of COVID-19 testing. (*See* Doc. No. 67-2, at 50.) And Prida, much like the plaintiff in *DeVore*, does not articulate any religious principle to support her Title VII claim. The only reasonable conclusion that can be drawn from the record is that Prida's objections to COVID-19 testing reflect, at most, a "personal moral code" that is unprotected by Title VII. *See DeVore*, 118 F.4th at 845 (citation omitted). Prida cannot establish that she held a sincere religious belief that conflicted with an employment requirement.

Prida resists this conclusion, arguing that *Sturgill* and *Lucky* require the Court to find that Prida's objections to COVID-19 testing are religious in nature. (*See* Doc. No. 78, at 12.) In making this argument, Prida glosses over a critical procedural difference—those decisions were made at

24

the motion to dismiss stage. *See Sturgill*, 114 F.4th at 806; *Lucky*, 103 F.4th at 1242. Ignoring the distinction, Prida argues, without support, that "[t]he same logic that governed the pleading standard governs the religious-nature inquiry on summary judgment[,]" that is, "whether the believer's articulated belief falls within the definition of religion . . . [is] controlled by the prohibition on questioning validity." (Doc. No. 78, at 12.) But this is untrue.

Although Prida's religious objections "may have been enough to satisfy Title VII's pleading requirement . . . . [t]hey fail at summary judgment[.]" *DeVore*, 118 F.4th at 848. The fact that Prida *pleaded* that she held a sincere religious belief in her complaint in no way means that she has *raised a genuine dispute of fact* on that belief at summary judgment. *See Sturgill*, 114 F.4th at 810 (noting that at the motion to dismiss stage, the Sixth Circuit "need not define the outer limits of Title VII's scope" and that it would instead "leave it to the parties to factually probe plaintiff's claims and defendant's actions during discovery, to the district court to test those facts at summary judgment[.]"); *see also Celotex*, 477 U.S. at 324 (recognizing that a nonmoving party cannot oppose a summary judgment motion by merely relying on the pleadings).

In deciding a motion for summary judgment, a court must assess whether there is sufficient evidence for a jury to reasonably find that Prida objected to COVID-19 testing on the basis of her religious beliefs. While it is true that "the claim of [a plaintiff] that [their] belief is an essential part of a religious faith must be given great weight[,]" *Seeger*, 380 U.S. at 184, that does not mean that the Court must accept a plaintiff's subjective categorization of their own belief system.[14] *See*

---

[14] Prida argues that the applicable test is "a subjective inquiry into the believer's own understanding, not an objective judicial assessment of whether the belief looks religious from the outside." (Doc. No. 70, at 10–11.) According to her interpretation, a belief is religious "where the plaintiff has articulated a belief that purports to be religious in her own framework[.]" (Doc. No. 78, at 8 (emphasis omitted).)

Prida's construction misinterprets the Supreme Court's holding in *Seeger*. As *Welsh v. United States* later clarified, "[*Seeger*'s] reference to the [defendant's] 'own scheme of things' was intended to indicate that the central

*Eshom v. King Cnty.*, 812 F. Supp. 3d 1190, 1199 (W.D. Wash. 2025) (holding that although courts may not substitute their judgment for that of the believer's nor ajudge the reasonableness of a belief, courts "need not accept entirely conclusory assertions of religious belief." (quotation marks and citation omitted)). Indeed, the Sixth Circuit's reversal of this Court's prior grant of Option Care's motion to dismiss expressly stated that "[e]xploration of [concerns that Prida's beliefs were not religious under Title VII] . . . is reserved to the discovery and summary judgment stage that will provide the opportunity to carefully scrutinize the basis of Prida's refusal to take Covid tests, including through a deposition of Prida." *Prida*, 2025 WL 460206, at *5; *see also Sturgill*, 114 F.4th at 810 ("[Defendant's] proffered 'obvious alternative explanation' for [plaintiff's] accommodation request—that it was rooted in medicine, not religion—is one we cannot simply credit *at this* [motion to dismiss] *stage*." (quotation marks and citation omitted) (emphasis added)).

To be clear, the Court is not questioning the *validity* of Prida's purported religious beliefs. It is not the Court's place to determine whether a plaintiff's alleged religious beliefs are valid in a theological sense because "[c]ourts are not arbiters of scriptural interpretation." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981). Rather, the Court is making a narrower assessment: whether Prida's purported objections to COVID-19 testing are "religious" as defined under Title VII. *See DeVore*, 118 F.4th at 846 ("The judicial task in assessing evidence of a religious conflict is narrow, but courts must nevertheless ensure the asserted conflict is sincerely based on a religious belief, rather than some other motivation[.]"

---

consideration in determining whether the [defendant's] beliefs are religious is whether these beliefs play the role of a religion and function as a religion in the [defendant's] life." 398 U.S. 333, 339, 90 S. Ct. 1792, 26 L. Ed. 2d 308 (1970). Neither *Welsh* nor *Seeger* go as far as to hold that the Court is bound to accept an individual's subjective categorization of their own beliefs. The Court instead must make an objective judicial assessment of whether the individual's beliefs are religious in consideration of that individual's lifestyle.

(quotation marks and citation omitted)). Although "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds[,]" *Hernandez v. Comm'r*, 490 U.S. 680, 699, 109 S. Ct. 2136, 104 L. Ed. 2d 766 (1989) (citation omitted), in Title VII cases alleging religious discrimination, courts are expressly required to determine whether a plaintiff's beliefs are religious in nature, *see Speer*, 2024 WL 4370773, at \*5 ("[I]n the context of an accommodation request, a court must determine that the belief in conflict with an employment requirement is religious rather than merely political or ideological." (citation omitted)); *Caruano*, 714 F. Supp. 3d at 467 ("[B]ecause individuals cannot 'cloak' all personal beliefs 'with religious significance,' a court must . . . scrutinize whether a sincerely held belief . . . is sufficiently connected to their religion." (citation omitted)). The Court recognizes that this determination "present[s] a most delicate question." *See Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). Yet, this assessment is necessary because to blindly accept a plaintiff's representation that their beliefs are "religious," without any further inquiry, would have the effect of granting them "a blanket privilege 'to make [their] own standards on matters of conduct in which society as a whole has important interests'" that is inconsistent with "'the very concept of ordered liberty[.]'" *See Africa*, 662 F.2d at 1031 (quoting *Yoder*, 406 U.S. at 215–16).

The Court has conducted such an inquiry, viewing the facts in the light most favorable to Prida, and determines that no jury could reasonably conclude that her objections to COVID-19 testing are religious in nature. Prida cannot establish a prima facie[15] case for failure to

---

[15] Option Care also argues that Prida's "body-as-a-temple" beliefs were insincerely held because she "engaged in activities that are fundamentally inconsistent" with those beliefs, such as making plasma donations, drinking wine,

accommodate under Title VII. Because Option Care has demonstrated that it is entitled to judgment as a matter of law, and Prida has failed to set forth specific facts showing a genuine triable issue, the Court grants summary judgment for Option Care as to Prida's Title VII failure to accommodate claim.

### b. Undue Hardship

Even if the Court were to find that Prida held a sincere religious belief that conflicted with an employment requirement, and that she also satisfied the other elements of her prima facie case, her Title VII claim would still fail. An employer need not accommodate the religious practices of its employees if doing so would impose an "undue hardship on the conduct of the employer's business." *Groff*, 600 U.S. at 454 (citing 42 U.S.C. § 2000e(j)). "'[U]ndue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* at 468. The undue hardship analysis encompasses economic costs, *see id.* at 470, as well as intangible costs such as office efficiency and the safety risk of an accommodation, *see Speer*, 2024 WL 4370773, at *10. It is not required that an employer show a materialized harm in order to meet the undue hardship standard. *Wise v. Children's Hosp. Med. Ctr. of Akron*, No. 24-3674, 2025 WL 1392209, at *4 (6th Cir. May 14, 2025) (citation omitted).

Here, Option Care presents undisputed evidence showing that it would have incurred undue hardship by accommodating Prida's request to be exempt from the COVID-19 testing requirement.

---

and having blood drawn. (*See* Doc. No. 81, at 13–14.) Option Care also details how Prida "does not adhere to several of JW's most fundamental practices." (Doc. No. 66, at 11 n.2.)

The Court declines to address the sincerity of Prida's beliefs. For one, courts must approach the sincerity of a purported religious belief with a "light touch." *Stein v. Austin*, No. 2:24-cv-990, 2025 WL 510060, at *6 (S.D. Ohio Feb. 14, 2025) (citing *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 486 (5th Cir. 2014)). Additionally, "sincerity rather than orthodoxy is the touchstone for determining whether a belief is sincerely held." *Dockery v. Maryville Acad.*, 379 F. Supp. 3d 704, 714 (N.D. Ill. 2019) (quotation marks and citation omitted). In any event, an analysis of the sincerity of Prida's beliefs is unnecessary because her objections to COVID-19 testing are not religious in nature.

No one disputes that Option Care's COVID-19 vaccination and testing policies were implemented "to safeguard the health and wellbeing of employees, their families, [its] patients, customers, visitors, others who spend time in [its] facilities, and the public[.]" (Doc. No. 67-2, at 25.) Each of Prida's proposed accommodations—(i) a wholesale exemption from COVID-19 testing (*see id.* at 58); (ii) that she participate in alternative COVID-19 testing methods such as "spit[ting] in a cup" or "blow[ing] into . . . a Kleenex" (Doc. No. 67-1, at 122); or (iii) transitioning her work to be fully remote (*id.* at 301)[16]—would have imposed a substantial burden on Option Care in the context of its business.

Prida presents no evidence genuinely disputing the safety risk posed by unvaccinated individuals during the COVID-19 pandemic. Her first two proposed accommodations fail to appreciate this danger and thus would have caused Option Care to incur undue hardship by posing safety risks to Option Care employees and patients. "'[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business.'" *Wise*, 2025 WL 1392209, at *4 (quoting *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975)). The Centers for Medicare & Medicaid Services Omnibus COVID-19 Health Care Staff Vaccination guidelines ("CMS Rule"), which Option Care was obligated to comply with, discussed in significant detail the health and safety risks posed by unvaccinated individuals. *See generally* Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555-01, 61558–61561. The CMS Rule advised employers to "ensure that they minimize the risk of transmission of COVID-19 to at-risk

---

[16] Prida's Option Care co-workers attempted to accommodate her by arranging her schedule such that she would only need to participate in COVID-19 testing once a month. (Doc. No. 67-1, at 254–56; Doc. No. 67-2, at 81.) This hypothetical accommodation, although unapproved by Option Care management, would have been unacceptable to Prida because she "didn't want to test[.]" (Doc. No. 67-1, at 255.)

individuals, in keeping with their obligation to protect the health and safety of patients" when granting exemptions or accommodations to COVID-19 vaccination or testing requirements. *Id.* at 61572. Consistent with this, Option Care required unvaccinated employees with an approved accommodation to participate in weekly COVID-19 testing.[17] (Doc. No. 67-2, at 51.) Granting Prida a wholesale exemption from COVID-19 testing would have posed substantial health risks to Option Care patients and employees.[18] (*See id.* at 60 (stating that COVID-19 testing was implemented to "provid[e] a safe environment for all of [Option Care's] team members and patients").) Permitting Prida to instead satisfy the COVID-19 testing requirement by "spit[ting] in a cup" or "blow[ing] into . . . a Kleenex" (Doc. No. 67-1, at 122) would likewise have posed health risks because such methods were not approved by Option Care leadership and were likely to contaminate the testing sample. (*See* Doc. No. 69-2, at 56.) Because "'Title VII does not require that safety be subordinated to the religious beliefs of an employee[,]'" Option Care was not required to accommodate Prida's objection to COVID-19 testing when doing so would have imposed an undue hardship on Option Care. *See Wise*, 2025 WL 1392209, at *4 (quoting *Draper*, 527 F.2d at 521).

Option Care has also demonstrated, via undisputed evidence, that it would have incurred undue hardship had it accommodated Prida's request for remote work. Option Care determined that Prida's job could not be done fully remote. (Doc. No. 68-1, at 59.) Transitioning Prida to a

---

[17] The CMS Rule did not require unvaccinated individuals to participate in daily or weekly COVID-19 testing. Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555-01, at 61614. It did state, however, that "nothing in this rule removes the obligation on providers and suppliers to meet existing requirements to prevent the spread of infection, which in practice means that these entities may also conduct regular testing alongside such actions as source control and physical distancing." *Id.*

[18] Prida was not a patient-facing employee. (Doc. No. 67-1, at 163.) But because her job responsibilities required her to engage in at least some in-person interaction with others (*see id.* at 90–91), she posed a transmission risk to other Option Care employees. These employees, in turn, would have likely posed a transmission risk to Option Care patients.

remote work arrangement would essentially necessitate creating a new role for her. (*Id.* at 72.) It would also have required other Option Care employees to fill in for Prida's pre-existing in-person responsibilities. As an organization with approximately 6,000 employees, the *ad-hoc* reassignment of responsibilities to accommodate Prida's request would have imposed undue hardship on Option Care, especially if such accommodation requests could be extrapolated to other employees who also desired such an accommodation. (*See* Doc. No. 69-1, at 13, 31–35.)

Prida does not meaningfully contest Option Care's undue hardship argument. Rather, she argues that Option Care failed to conduct an individualized health-risk assessment as part of the undue hardship analysis. (*See* Doc. No. 78, at 21.) But Title VII imposes no such requirement. *See Savel v. MetroHealth Sys.*, No. 24-4025, 2025 WL 1826674, at *2 (6th Cir. July 2, 2025) (citation omitted). Prida's argument is unavailing. *See id.*

The Court concludes that even if Prida had established a prima facie case for failure to accommodate under Title VII, Option Care would still be entitled to summary judgment on the basis of undue hardship.[19]

### 2.  *Title VII Retaliation Claim*

Title VII also prohibits retaliation. To make a prima facie showing of Title VII retaliation, Prida must show that she "(1) engaged in protected activity, (2) her employer knew of the exercise of the protected right, (3) her employer took an adverse employment action against her, and (4) there was a causal connection between protected activity and the adverse employment action."

---

[19] Option Care also argues that it would have incurred undue hardship because failure to comply with the CMS Rule could have resulted in the loss of $220,000 in Cares Act funding. (*See* Doc. No. 66, at 22.) Although this weighs in favor of finding undue hardship, the Court has insufficient information to assess whether such loss of funds would be substantial in the context of Option Care's business. *See Groff*, 600 U.S. at 468 (characterizing the Title VII undue hardship analysis as a "fact-specific inquiry").

*DiChiara v. Summit Med. Grp., Inc.*, No. 25-5396, 2026 WL 2017900, at \*4 (6th Cir. July 13, 2026) (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)) (quotation marks omitted). "Under Title VII, protected activity can fall into two categories: participation and opposition." *Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 357 (6th Cir. 2020) (citation omitted); *see* 42 U.S.C. § 2000e-3(a) (making it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]" or "because he has . . . participated . . . in an investigation, proceeding, or hearing under [Title VII]").

Prida cannot establish that there was a causal connection between her alleged protected activity[20] and any adverse employment action. "To prove causation in a Title VII retaliation case, a plaintiff must show that the employee's protected activity was a 'but for' cause of the employer's adverse action against her, meaning the adverse action would not have occurred absent the employer's desire to retaliate." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)). The plaintiff has the burden of producing sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in protected activity. *Id.* (citation omitted). Although this burden "is not onerous," *id.* (quotation marks and citation omitted), temporal proximity between the protected activity and the adverse employment action alone is insufficient to find a causal connection, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). A causal connection may be inferred,

---

[20] For the purposes of this analysis, the Court assumes that Prida has engaged in protected activity. The Court notes, however, that Option Care contends that Prida did not engage in any protected activity under Title VII. (*See* Doc. No. 66, at 24–25.) The Court does not address this argument because Prida's retaliation claim plainly fails to establish causation.

however, when temporal proximity is coupled with other indicia of retaliatory conduct. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (collecting cases).

Here, Prida fails to even present evidence of temporal proximity between her alleged protected activities and any adverse employment action. The two relevant points of reference are: (i) the date Prida communicated to Option Care that she would not comply with COVID-19 testing (*i.e.*, the date of her alleged protected activity); and (ii) the date Prida was terminated (*i.e.*, the date of her alleged adverse employment action).[21] Prida's refusal to participate in mandatory COVID-19 testing occurred *after* Option Care had established a policy requiring the termination of unvaccinated employees who failed to comply with COVID-19 testing. Courts may not consider the temporal proximity of an adverse employment action as evidence of causality when the employer "proceed[s] along lines previously contemplated[.]" *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (quoting *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)) (citation modified). Option Care's COVID-19 vaccination policy, adopted on August 13, 2021, expressly states that employees granted an

---

[21] Although Prida does not make any argument that she has proven causation, she appears to construe the timeline of her retaliation claim differently. She suggests that her first instance of protected activity was her initial request for an accommodation on December 28, 2021. (*See* Doc. No. 10 ¶ 76; Doc No. 78, at 24.) She also appears to claim that Option Care engaged in retaliatory conduct before her ultimate termination, contending that she suffered adverse employment actions through "harassing emails" and the "unlawful exposure of [her] private medical information[.]" (*See* Doc. No. 10 ¶ 81; Doc No. 78, at 24–25.)

As to the former, "[a] request for an accommodation does not constitute protected activity under Title VII[.]" *Stanley*, 808 F. App'x at 358; *see also Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 406 (6th Cir. 2025) ("[A] plaintiff cannot bring a Title VII retaliation claim when he alleges only that he made an accommodation request and that the employer denied the request."). The Court therefore concludes that December 28, 2021, is not the appropriate starting point for the temporal analysis. As to the latter, an "adverse employment action" in the retaliation context "consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Michael*, 496 F.3d at 596 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). But Prida never identifies what she is referring to by "harassing emails" or Option Care's alleged "unlawful exposure" of Prida's medical information, nor does she explain how these actions would constitute an "adverse employment action." The Court therefore finds that Prida's termination on March 9, 2022, is the solely identified "adverse employment action" relevant to her retaliation claim.

33

exemption from the COVID-19 vaccination "*will be required* to be enrolled in the Option Care Health COVID-19 Testing Program." (Doc. No. 67-2, at 26 (emphasis added).) Implicit in this language is that failure to comply could result in disciplinary action. And, as of February 11, 2022, Coe informed Anastasopoulos that "[t]here is no route around testing" and that employees "will be terminated if they do not comply with testing if they have a[] [COVID-19 vaccine] accommodation." (Doc. No. 69-2, at 51.) The undisputed evidence presented overwhelmingly indicates that Option Care had in place an established policy of terminating employees who refuse to comply with COVID-19 testing well in advance of Prida's February 25, 2022, email protesting the COVID-19 testing requirement. (*See* Doc. No. 67-2, at 56.) Prida's subsequent termination on March 9, 2022, for failing to comply with the COVID-19 testing requirement does not demonstrate temporal proximity because Option Care was merely "proceeding along lines previously contemplated[.]" *See Montell*, 757 F.3d at 507 (citation omitted). At bottom, Prida was terminated for failing to comply with Option Care's preexisting policy requiring COVID-19 testing for unvaccinated individuals, not because she protested the perceived illegality of Option Care's actions.

Prida claims in conclusory fashion that her protected activity caused adverse employment action. (*See* Doc. No. 10 ¶ 81; Doc. No. 78, at 24–25.) But she does not point to evidence demonstrating temporal proximity, much less the requisite "other indicia" of retaliatory conduct. *See Dixon*, 481 F.3d at 333 (collecting cases). Her sole argument is that *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 135 S. Ct. 2028, 192 L. Ed. 2d 35 (2015), precludes Option Care's argument. But *Abercrombie* addresses what a plaintiff must prove to assert a Title VII *disparate treatment claim*; it says nothing about retaliation claims. *See id.* at 773.

34

Prida cannot demonstrate that there was a causal connection between her protected activity and any adverse employment action and, therefore, cannot establish her prima facie case. Because Option Care has demonstrated that it is entitled to judgment as a matter of law, and Prida has failed to set forth specific facts showing a genuine triable issue, the Court grants summary judgment for Option Care as to Prida's Title VII retaliation claim.

        *3.        Ohio Rev. Code § 4112.02 Religious Discrimination Claim*

Ohio Rev. Code § 4112.02 makes it unlawful for "any employer, because of the . . . religion . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). The analysis of Ohio Rev. Code § 4112.02 is identical to that of Title VII claims. *See, e.g., Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 66 421 N.E.2d 128, 131 (Ohio 1981) (collecting cases); *Savel*, 96 F.4th at 942; *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003) (citation omitted).

Because Prida's state law claim "rise[s] and fall[s] with [her] Title VII claims[,]" *Prida*, 2025 WL 460206, at *8 (citing *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)), the Court grants summary judgment for Option Care as to Prida's Ohio Rev. Code § 4112.02 religious discrimination claim.

**B.  Prida's Motion for Partial Summary Judgment**

Prida moves for partial summary judgment "on the threshold question[,] common to all of her claims[,] that she holds a sincere religious belief that conflicts with an employment requirement." (Doc. No. 70, at 2.) She also requests that the Court hold that Option Care "failed

to engage in an interactive process[22] with respect to [Prida's] request for accommodation from the [COVID-19] testing requirement." (*Id.* at 3 (citation modified).) Prida represents that the only remaining issue for trial is "whether any accommodation that survived the interactive process would have imposed an undue hardship [on Option Care]." (*Id.*)

Viewing the evidence in a light most favorable to Prida, the Court has determined that Option Care is entitled to summary judgment on all of Prida's claims. Consequently, Prida's motion for partial summary judgment necessarily fails. The Court denies Prida's motion for partial summary judgment.

## IV.    CONCLUSION

Although Prida's claims may have survived a motion to dismiss, the record adduced after discovery reveals that no jury could reasonably find for Prida as to any of her claims. For the foregoing reasons, the Court **GRANTS** Option Care's motion for summary judgment (Doc. No. 66) and **DENIES** Prida's motion for partial summary judgment (Doc. No. 70). This case is **DISMISSED**.

**IT IS SO ORDERED**.

Dated: July 31, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[22] The relevance of Option Care's alleged failure to engage in an "interactive process" is not entirely apparent. Prida appears to argue that Option Care's alleged failure to engage in an "interactive process" gives rise to a Title VII claim (*see* Doc. No. 10 ¶ 1), but her motion for partial summary judgment discusses Option Care's alleged failure to engage in an "interactive process" to argue that Option Care cannot prove that her proposed accommodation would have posed undue hardship (Doc. No. 70, at 22).

The Court need not address this argument because the Sixth Circuit has not recognized that Title VII imposes an implicit interactive-process duty. *See Kizer v. St. Jude Children's Rsch. Hosp.*, No. 24-5207, 2024 WL 4816856, at *5 (6th Cir. Nov. 18, 2024).